UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

XAVIER LOPEZ,

                   Plaintiff,                                **OPINION & ORDER**

         -against-

CITY OF NEW YORK,                          16-cv-4934 (NG) (SJB)

                   Defendant.

-------------------------------------------------------- x
**GERSHON, United States District Judge:**

Plaintiff Xavier Lopez, a former probationary firefighter with the New York City Fire Department ("FDNY"), commenced this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-a *et seq.* ("Title VII"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"). He claims that he was discriminated against on the basis of his race, national origin, and age, and that he was retaliated against for complaining about his treatment.[1] Defendant City of New York now moves for summary judgment. For the reasons set forth below, the motion is granted.

I. **Factual Background**

For the purposes of the present motion, the following facts are undisputed unless stated otherwise.

    a. **The *Vulcan* Lawsuit**

In May 2007, the United States of America filed suit under Title VII against the City of New York in this district, alleging, *inter alia*, disparate impact violations in the hiring practices

---

[1] In the complaint, plaintiff also claims retaliation based on his relationship to the *Vulcan* lawsuit, discussed below. Defendant moves to dismiss this theory of the Title VII retaliation claim, and plaintiff fails to oppose it. It is therefore deemed abandoned. *See, e.g.*, *Adams v. N.Y. State Educ. Dep't*, 752 F. Supp. 2d 420, 452 n.32 (S.D.N.Y. 2010).

of the FDNY.  *See United States v. City of New York*, 07-CV-2067 (NGG)(RLM) (E.D.N.Y.) ("*Vulcan* lawsuit") Dkt. No. 1.  Specifically, the United States alleged that the City's use of written examinations to screen applicants for entry-level firefighter positions, and its decision to rank-order applicants who passed the written examinations for further consideration, had an unlawful disparate impact on Black and Hispanic applicants.  *Id.*  On September 5, 2007, the Vulcan Society, an organization of Black firefighters, intervened under Title VII on behalf of a class of Black people who had previously applied for positions with the FDNY.  *United States v. City of New York*, 2007 WL 2581911 (E.D.N.Y. Sept. 5, 2007).  On July 22, 2009, the City of New York was found liable for discrimination based on disparate impact.  *United States v. City of New York*, 637 F. Supp. 2d 77, 79 (E.D.N.Y. 2009).  The remedial process of the *Vulcan* lawsuit resulted in the establishment of a "priority hire" list of Black and Hispanic individuals who had previously applied to and were rejected by the FDNY based on the discriminatory hiring practices found by the court.  *See United States v. City of New York*, 681 F. Supp. 2d 274 (E.D.N.Y. 2010).

> **b.  Plaintiff's Application, Hiring, and Participation in the Firefighter Academy Class Beginning January 2014**

In 2002, plaintiff, who identifies as Hispanic, applied to become a firefighter with the FDNY, but his application was rejected.  In 2012, plaintiff reapplied, passed Firefighter Exam Number 2000, which was developed in connection with the *Vulcan* lawsuit, and was granted priority hire status.  Plaintiff entered the FDNY firefighter academy on January 27, 2014 at the age of 38.

According to plaintiff, while at the academy, he overheard Firefighter ("FF") Robert Derrig, a white drill instructor, tell another drill instructor that plaintiff was a priority hire. Plaintiff testified that another of the white trainers, FF John Virgonda, used the racial epithet,

"spic," in plaintiff's presence when speaking to another Hispanic firefighter.   Plaintiff Dep. at 57:18–25.   He also reported that, if Black or Hispanic probationary firefighters failed to complete a task, they were made to do 100 push-ups or 50 pull-ups, but he did not see white probationary firefighters ordered to do the same.   Plaintiff offers no other testimony or evidence to support his conclusion that similarly situated white probationary firefighters were treated differently from Black or Hispanic firefighters after failing to complete tasks.   He also offers no evidence that Derrig and Virgonda had the power to hire or fire any employees.

During the second week of the firefighter academy, plaintiff suffered an ankle injury while jogging.   He did not inform anyone at the academy that he was injured, and instead called a supervisor of his, Lieutenant DiBiase,[2] from his home later in the evening.   After plaintiff was treated by Dr. Kerry Kelly, the Chief Medical Officer at the FDNY's Bureau of Health Services ("BHS"), he was placed on medical leave for a sprained ankle.   Plaintiff's records from BHS indicate that, during his visit, plaintiff requested physical therapy for his knee, but Dr. Kelly denied the request because there was no record that plaintiff hurt himself on the job.   According to plaintiff, while Dr. Kelly was examining his ankle, she told him that "maybe [he was] too old."   Plaintiff Dep. at 73:13–21.

Shortly thereafter, plaintiff was evaluated by Dr. R. Gasalberti, a BHS orthopedist. Because plaintiff's ankle injury prevented him from performing the physical requirements of the firefighter academy, Dr. Gasalberti placed plaintiff on light duty.

While on light duty, plaintiff was assigned to FDNY's headquarters to perform duties such as working the security desk and answering telephone calls.   Plaintiff testified that he and another probationary firefighter were also made to throw out garbage and file "all the heavy

---

[2] Where first names of individuals are not included, it is because their names were not provided in the record.

work," while the other firefighters on light duty "used to wash their cars and get [their supervisor, Chief John Regan] coffee."  Plaintiff Dep. at 70:3–13.  Plaintiff attributed the difference in his treatment to his race and national origin.  But has not provided the testimony of other firefighters, or any other evidence, to support his claim that Hispanic firefighters were given heavier work than white firefighters.  Plaintiff also testified that Chief Regan directed him to trace the letters of the alphabet, questioning whether plaintiff could "even read or write English."  Plaintiff Dep. at 76:11–77:5.  Defendant does not dispute that Chief Regan criticized plaintiff's handwriting and asked plaintiff to trace the alphabet, but takes the position that it was because of illegible writing, not racism.

Plaintiff offers no evidence to dispute that plaintiff's supervisor, Chief Regan, did not evaluate plaintiff's performance while plaintiff was assigned to light duty.  Plaintiff also offers no evidence to dispute Chief Regan's testimony that he did not have the power to hire or fire any employees, never recommended the termination of any firefighter, was never asked if he had any recommendation about whether to terminate plaintiff, and never spoke to anyone at BHS about plaintiff.

While on light duty, plaintiff saw Dr. Viola Ortiz, a BHS physician who authorized an outside orthopedic evaluation of his ankle.  At an appointment on March 4, 2014, Dr. Ortiz noted that plaintiff had failed to see an orthopedist, but that plaintiff had informed her that a visit was scheduled for March 7, 2014.  On March 11, 2014, plaintiff told Dr. Ortiz that the appointment was now scheduled for March 12, 2014.  At the following week's appointment, plaintiff told Dr. Ortiz that a doctor had recommended an MRI for him, but Dr. Ortiz noted that there was no paperwork from the doctor to that effect.  Examination Reports dated April 1 and 15, 2014, documented that plaintiff reported feeling better; and on April 22, 2014, Dr. Ortiz noted that the

4

MRI that was eventually taken of plaintiff's left ankle was "normal." Following his April 22, 2014 examination, Dr. Ortiz listed plaintiff as returning to full duty effective April 23, 2014.

### c.  Firefighter Academy Class Beginning July 2014

On July 7, 2014, plaintiff resumed his firefighter academy training with the next class of recruits. During this time, according to plaintiff, FF Derrig again called plaintiff "priority hire." He also, according to plaintiff, called plaintiff "dumb," and "George Lopez"—a reference to a Mexican-American comedian. Plaintiff Dep. at 84:24–85:25; 119:8–14. Plaintiff also recounted that FF Derrig abused him physically by kicking him while he was performing training drills known as evolutions.

In late August 2014, while performing a particularly difficult evolution, plaintiff injured his left knee. He testified that, while entering the ambulance to receive treatment after that injury, Captain Robert Bruno, an executive officer in the firefighter academy, "physically tried to attack [plaintiff], and then Robert Derrig held [Bruno] back. And as soon as he called Robert Bruno down, Robert Derrig went inside and threatened [plaintiff] and said he was going to get [plaintiff]." Plaintiff Dep. 96:21–97:25. Plaintiff was taken to Columbia Presbyterian's emergency room and treated there.

Following that injury, plaintiff saw Dr. Pierce Ferriter, a BHS physician, and was placed on medical leave for approximately one week. Dr. Ferriter indicated that there was a wound on plaintiff's knee with soft tissue swelling causing pain, but he also noted that plaintiff was able to extend and flex his knee. Three days later, plaintiff was seen by Dr. Ortiz, who noted that there were no open wounds, no redness, and that plaintiff had good range of motion, despite complaints of pain. On August 27, 2014, plaintiff saw Dr. Kelly, who noted that the wound was closed and that plaintiff was able to squat. Dr. Kelly returned plaintiff to full duty, effective August 28, 2014.

5

A few days after returning to the firefighter academy, plaintiff reinjured his knee and injured his toe while exercising and was again placed on light duty.

While on light duty, plaintiff was assigned to Fort Totten and supervised by Captain John Kelly.  His duties included washing trucks, throwing out the garbage, and washing dummies. Plaintiff testified that, while he and another Hispanic probationary firefighter, Xavier Polanco, would perform duties such as washing dummies, two white probationary firefighters would get coffee and go home.  When he asked a lieutenant at Fort Totten why the white probationary firefighters could not help with plaintiff's duties, plaintiff was told that the other firefighters were responsible for answering phones.  Plaintiff testified, however, that he did not observe the white probationary firefighters performing those duties.  Plaintiff did not provide any other evidence showing that Hispanic and Black probationary firefighters were treated disparately.

BHS physician Dr. Lewis Miller saw plaintiff a week following his toe injury.  Dr. Miller observed that plaintiff was again complaining of left knee pain and that there was slight bleeding on his toe.  The following day, plaintiff saw Dr. Dutkowsky,[3] who noted that plaintiff's toenail was intact without any swelling or discoloration and that, although plaintiff complained of "subjective pain," his left knee was not swollen and showed "no instability or laxity."  Ex. K at D000107.  Plaintiff testified that during this examination, Dr. Dutkowsky told him that "maybe this job isn't for you."  Plaintiff Dep. at 104:3–8.

On September 5, 2014, plaintiff returned to Dr. Kelly, who noted that his toenail was being pushed out by a new nail with no sign of infection, and that, despite complaints of pain,

---

[3] Plaintiff, in his deposition, referred to a BHS physician named "Dr. Charlie" having made comments about his age.  The parties never identify who this doctor is, and no records were located of a Dr. Charlie having treated plaintiff.  However, in a recording of a visit with Dr. Charlie that plaintiff produced in discovery, which was annexed to defendant's motion, Dr. Charlie identifies himself as "Dr. D."  It therefore seems that Dr. Charlie is Dr. Dutkowsky.

plaintiff's left knee was stable, and he was able to bend it to 90 degrees. Dr. Kelly authorized plaintiff to see an outside provider to obtain an MRI of his knee. When plaintiff returned to see Dr. Kelly the following week, plaintiff had not had an MRI because he had not realized that Dr. Kelly had authorized him to obtain one. Dr. Kelly again authorized plaintiff to obtain an MRI, authorized a podiatry consultation for his right toe, and directed plaintiff to see Dr. Gasalberti on his next visit. When plaintiff saw Dr. Gasalberti five days later, plaintiff had not yet seen a podiatrist and had not undergone MRI imaging.

Plaintiff again saw Dr. Kelly on September 25, 2014. According to her notes, plaintiff "states he saw podiatrist, he brings in no note, states he was told to do toe [physical therapy], he has no authorization, states he went for mri on sept 23rd, no report here." Ex. K at D000111. Records from a visit with Dr. Gasalberti on October 1, 2014 indicate that plaintiff's MRI was found to be negative, as was an x-ray of his toe, and Dr. Gasalberti indicated that plaintiff's knee had good range of motion.

On November 9, 2014, plaintiff again saw Dr. Gasalberti and was advised that a recent MRI indicated that there were no tears of his ligaments and menisci. Dr. Gasalberti wrote that plaintiff "can sit in a chair at 90 degrees however state[s] he can't squat to 90 degrees." Ex. K at D000117. On November 20, 2014, plaintiff was seen by Dr. Ferriter, who found that plaintiff's knee showed no swelling or redness, was stable, and had full range of motion. Dr. Ferriter noted that plaintiff was "still unfit for full duty based on his subjective complaints of pain" even though his "knee objectively is stable with normal range of motion." Ex. K at D000118.

Plaintiff was scheduled to see Dr. Diana Mannor, an orthopedist with BHS, on November 26, 2014. However, his appointment was cancelled when he arrived late. At the next appointment, on December 19, 2014, plaintiff had been rescheduled to see Dr. Mannor, but Dr.

Kelly noted that plaintiff had "still not been seen by ortho due to arriving late for appointments, and he rescheduled another [appointment] and he did not bring in required documents." Ex. K at D000120.  On December 22, 2014, plaintiff finally saw Dr. Mannor.  She concluded that no further orthopedic treatment was needed, though she noted that plaintiff still complained of knee pain.  Plaintiff never returned to the firefighter academy.

### d.  Conflict with Firefighter Michael Eberheardt

When plaintiff was present for treatment in BHS, he would wait to be seen in a waiting room.   While waiting, plaintiff experienced conflict with a firefighter named Michael Eberheardt.  Plaintiff describes Eberheardt as a firefighter who was being disciplined and who was assigned to work at BHS.  Plaintiff testified that the conflict began after plaintiff "got into a problem with one of [FF Eberheardt's] friends."  Plaintiff Dep. at 82:3–8.  Following that incident, according to plaintiff, FF Eberheardt referred to plaintiff as a "priority hire" and treated plaintiff "less well" than his white counterparts because he would "make [plaintiff] sit down" and let "all the other white firefighters" go right through to BHS.  Plaintiff Dep. at 76:11–24; 82:9–22.  Yet, plaintiff testified that another individual informed him that, because he was a probationary firefighter, he would "always go" behind the experienced firefighters.  Plaintiff Dep. at 131:6–25.

### e.  Meetings with Marshall and Acholonu

Around August 2014, while assigned to light duty, plaintiff ran into the diversity advocate for the FDNY, Lieutenant Michael Marshall, while in the elevator at BHS.  During that impromptu meeting, plaintiff told Lt. Marshall that FF Derrig had harassed and targeted plaintiff, including by calling him George Lopez, and that he had interfered with his work and exams.  Lt.

Marshall told plaintiff that he would look into his complaints.  Plaintiff testified that a few weeks later he ran into Lt. Marshall again and repeated his complaints.

After these two informal meetings with Lt. Marshall, plaintiff eventually had a more formal meeting in late December of 2014 with Lt. Marshall and Toma Acholonu, an EEO Officer for the FDNY.  According to plaintiff, at that meeting, he complained about the behavior of FF Derrig, Chief Regan and FF Eberheardt.  The parties dispute what treatment plaintiff complained about during the conversation, but there is no dispute that Lt. Marshall informed plaintiff that EEO complaints will "follow [plaintiff] back to the fire house" and that people "get harassed for filing EEO complaints."  Marshall Dep. at 73:10–13; 80:6–17.  Plaintiff did not file a formal EEO complaint.

### f.  Termination

On January 14, 2015, plaintiff received a letter terminating him from his position with the FDNY.  The letter did not state a reason for the termination.  While the letter was signed by Fire Commissioner Daniel Nigro, it is undisputed that the decision to fire plaintiff was made by the FDNY Chief of Personnel, Michael Gala, with input from Dr. Kelly.

Defendant's position is that plaintiff was terminated based on his inability to return to a third firefighter academy as a result of his subjective complaints of pain, which were unsupported by medical evidence.  Specifically, according to Dr. Kelly, plaintiff was

> not capable of working as a firefighter based on his continued symptomology, in light of, essentially, a negative work up, an opportunity to [complete] physical therapy, [plaintiff's] failure to pursue outside orthopedic consultations when [BHS] gave him the authorization, and his evaluation by [BHS] medical team, who saw no physical disability [despite his] persistent subjective complaints.

Dr. Kelly Dep. at 65:3–18.

Plaintiff did not testify to any discriminatory comments made by any physicians at BHS about his race or national origin.

### g.  Age-Related Comments

Plaintiff's federal claims are based solely on discrimination related to his race and national origin; age is not a protected characteristic under Title VII, the statute under which plaintiff sues.  *See* 42 U.S.C. § 2000e-2(a).  Plaintiff's NYCHRL claims, on the other hand, are based on age discrimination, in addition to his race and national origin discrimination.[4]  Because plaintiff's allegations of age discrimination are irrelevant to his federal claims, and because, as discussed below, I do not exercise supplemental jurisdiction over the NYCHRL claims, I have not summarized the age-related comments,[5] and they are not discussed in the legal conclusions below.

### h.  Plaintiff's Declaration

In an effort to avoid summary judgment, plaintiff submitted an unsworn, non-notarized affidavit dated September 27, 2019, which asserts for the first time that plaintiff was "present when Chief Gala stated to Chief Regan: 'priority hires are wasting the spot for other probies to get into the Academy,' and 'they don't belong here, I want [priority hires] out.'"  During discovery, plaintiff was deposed at length and testified to overhearing a conversation between Chief Regan and Chief Gala.  He was asked expressly about that conversation, but he did not mention these—or any other—discriminatory comments by Chief Gala at that time.  As the Second Circuit has explained,

---

[4] Unlike the federal Age Discrimination in Employment Act of 1967 that protects individuals who are 40 years of age or older, 29 U.S.C. §§ 621, *et seq.*, the NYCHRL extends to workers under the age of 40.

[5] For example, plaintiff testified to hearing supervisors refer to him as an "old fuck" and an "old fart."  Plaintiff Dep. at 60:1–62:9.

> [a] party may not defeat summary judgment 'by submitting an affidavit in
> opposition to a summary judgment motion that, by omission or addition,
> contradicts the affiant's previous deposition testimony,' *Hayes v. N.Y.C. Dep't of
> Corr.*, 84 F.3d 614, 619 (2d Cir. 1996), particularly where the contradiction 'is
> left unexplained—indeed, is inexplicable,' *In re Fosamax Prods. Liab. Litig.*, 707
> F.3d 189, 194 (2d Cir. 2013) (per curiam).

*Johnson v. Schmid*, 750 F. App'x 12 (2d Cir. 2018).  In the new declaration, plaintiff has not

provided any explanation for not providing this testimony earlier.  I agree with defendant that it

would be improper and unfair to permit plaintiff to now rely on such a declaration to defeat the

present motion; I therefore do not consider it.

## II.   Standard of Review

Summary judgment is appropriate only where, considering "the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or

other materials," Fed. R. Civ. P. 56(c), "the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  In determining whether there is a genuine issue of material fact, a court resolves all

ambiguities and draws all justifiable inferences in favor of the non-moving party.  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Second Circuit has repeatedly noted that "an extra measure of caution is merited in

[granting] summary judgment in a discrimination action because direct evidence of

discriminatory intent is rare and such intent often must be inferred from circumstantial evidence

found in affidavits and depositions."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d

Cir. 2006); *accord Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016).

Nevertheless, "summary judgment remains available for the dismissal of discrimination claims in

cases lacking genuine issues of material fact." *Schiano*, 445 F.3d at 603 (internal quotation marks omitted).

### III.  Discussion

#### a.  Plaintiff's Title VII Discrimination Claim

Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  In 1991, the statute was amended to provide that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).  Thus, a plaintiff seeking to defeat a motion for summary judgment in an employment discrimination case need not "show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).

The parties agree that I should analyze plaintiff's claim of discriminatory termination under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  The initial burden is borne by plaintiff, who must establish a *prima facie* case of discrimination by showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).  Notably, the "burden of

establishing a *prima facie* Title VII case is *de minimis*."  *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (internal quotation marks and alterations omitted).

If plaintiff establishes a *prima facie* case of discrimination, then the burden shifts to the defendant to "articulate some legitimate, non-discriminatory reason" for the employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).

Finally, if the defendant meets its burden and provides such a reason, the "plaintiff may no longer rely on the presumption raised by the *prima facie* case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of [unlawful] discrimination."  *Holcomb*, 521 F.3d at 138.  The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

There is no dispute that plaintiff, who describes himself as Hispanic, is a member of a protected class.  Nor is there a dispute that he was qualified for the job, or that his termination constituted an adverse employment action.  Defendant argues, however, that plaintiff's claim of discriminatory termination fails at the preliminary stage of the *McDonnell Douglas* analysis because plaintiff has offered no evidence to support the conclusion that his termination took place under circumstances giving rise to an inference of discrimination based on race or national origin.

Plaintiff argues that the discriminatory intent behind plaintiff's termination is evidenced by the fact that—unlike plaintiff—white probationary firefighters were given the opportunity to

complete a third fire academy, and by discriminatory statements made by FDNY employees in plaintiff's presence.  Defendant maintains that plaintiff's argument is undermined by his failure to point to any similarly situated individuals who were treated differently and by his failure to show that the discriminatory statements indicate that his race or national original were a motivating factor in his termination.

As to plaintiff's first argument, an inference of discrimination may be drawn where an employer has demonstrated more favorable treatment of employees outside of the protected group.  *See, e.g.*, *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).  Although a plaintiff "is not obligated to show disparate treatment of an *identically* situated employee," he must demonstrate that any such employees "have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."   *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (emphasis in original).  "Conclusory statements that 'similarly situated' employees outside the protected class were treated more favorably are insufficient to defeat summary judgment." *Desir v. Bd. of Coop. Educ. Servs. (BOCES) Nassau County*, 803 F. Supp. 2d 168, 181 (E.D.N.Y. 2011), *aff'd*, 469 F. App'x 66 (2d Cir. 2012).

In support of his theory that he was treated differently because of his race or national origin, plaintiff points to six other firefighters who were given more than two opportunities to complete the fire academy.  But, of the six, four were priority hires like plaintiff, one was a Hispanic man like plaintiff, and plaintiff has not presented any evidence indicating that the injuries or situations of the two white firefighters who were given three opportunities were comparable to his.  As to his allegations that white probationary firefighters were given different—presumably better—assignments while on light duty; that Hispanic probationary

14

firefighters were subjected to greater scrutiny while in the firefighter academy; and that white firefighters were allowed to go ahead of him in line at BHS, plaintiff's conclusory statements, without more, are insufficient to meet his burden of showing that similarly situated white individuals were treated more favorably than employees of the protected group.

As to the discriminatory comments made about or to him while an FDNY employee, plaintiff fails to respond to defendant's argument that, even assuming all the comments asserted by plaintiff were made, they were, at most, stray comments, attributed to non-decisionmakers and, as such, cannot serve as predicates for his discrimination claim.  *See Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (factors to determine whether remarks are probative of discrimination include "(1) who made the remark (i.e. a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e. whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e. whether it was related to the decision-making process).").  While Dr. Kelly and Chief Gala did have decision-making authority, plaintiff did not testify to either of them making any discriminatory comments based on his race or national origin.  In sum, I find that plaintiff has not presented a *prima facie* case of discrimination because he has not met his burden of showing that his termination occurred under conditions giving rise to an inference of discrimination.

Even if I were to treat plaintiff as having met the minimal burden of establishing a *prima facie* case, on the record as a whole, no reasonable jury could conclude that he was discriminated against on the basis of his race or national origin.  Defendant has presented evidence that plaintiff's inability to return to a third firefighter academy based on subjective complaints of pain, unsupported by medical evidence, supplied a legitimate non-discriminatory reason for his

termination.  Defendant is therefore "entitled to summary judgment unless [plaintiff] can point to evidence that reasonably supports a finding of prohibited discrimination."  *Rowe v. Jagdamba, Inc.*, 302 F. App'x 59, 62 (2d Cir. 2008).

To carry his burden at this stage, plaintiff need not establish that the proffered reasons for his dismissal "were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 141 (internal quotation marks omitted); *see also* 42 U.S.C. § 2000e–2(m). Nevertheless, in opposition to summary judgment, plaintiff argues that he can meet his burden because defendant's medical reasons constituted "mere conjecture and [were] not backed by any medical support."  Plaintiff's Opposition at 17.  But plaintiff offers no evidence—medical or otherwise—to dispute the abundant medical evidence from laboratory tests as well as clinical observation proffered by the defendant that he has no objective signs of physical injury keeping him from performing as a firefighter.  Therefore, he cannot rely on a claimed lack of medical support as evidence of defendant's discrimination.  Moreover, on the totality of the evidence, plaintiff cannot meet his ultimate burden of showing by a preponderance of the evidence that discrimination based on race or national origin was a motivating factor in the decision to terminate him.

Defendant's motion for summary judgment is granted and plaintiff's Title VII claim for discrimination based on his race and national origin is dismissed.

### b.  Plaintiff's Title VII Hostile Work Environment Claim

Plaintiff also brings a claim under Title VII for hostile work environment based on his poor treatment by colleagues, supervisors, and medical staff at the FDNY because of his race and national origin.  It is "axiomatic" that a plaintiff alleging a hostile work environment claim must

16

demonstrate that the conduct occurred because of a protected characteristic.  *Bliss v. MXK Rest. Corp.*, 220 F. Supp. 3d 419, 423 (S.D.N.Y. 2016) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).  Plaintiff must also present sufficient evidence to prove that the harassment he suffered based on his race or national origin was "sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).[6]  The plaintiff here does not rely on a single incident of harassment that he claims was sufficiently severe to transform his workplace into a hostile environment.  *Cf. Redd v. New York Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012).

Rather, he relies on a claim of pervasive hostility or mistreatment.  Pervasiveness requires that the offensive behavior be "continuous and concerted" rather than merely "episodic," and isolated incidents typically will not amount to discriminatory changes in the "terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  "[W]hether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment."  *James v. Van Blarcum*, 782 F. App'x 83, 85 (2d Cir. 2019) (alteration in original) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997)).

In terms of racist statements, plaintiff testified to hearing FF Derrig refer to him as a priority hire and "George Lopez" and FF Virgonda's use of a racist slur about Hispanic people in plaintiff's presence.  Plaintiff also testified regarding an incident in which Chief Regan made plaintiff trace the alphabet, which plaintiff inferred was done based on his presumed inability to

---

[6] Because I find that the behavior was not sufficiently severe or pervasive, I need not address the second element required to establish a hostile work environment claim, that a specific basis exists for imputing the objectionable conduct to his employer.  *See Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

read and write in English.  With regard to other behavior that plaintiff found hostile, he testified to conflict with FF Eberheardt, which, when viewed in the light most favorable to the nonmoving party, amounted to, at most, isolated incidents of racial enmity.  Plaintiff also testified to an incident where Captain Bruno attempted to physically attack him.  However, plaintiff did not testify to any comments by Captain Bruno about plaintiff's race or national origin and failed to provide any reason why plaintiff believed Captain Bruno's behavior was motivated by discrimination.

Even taking into consideration all of the statements or acts that can be attributed to plaintiff's race or national origin, they are insufficient to constitute an intolerable alteration of the terms and conditions of his employment.  Under the totality of circumstances, these incidents amount to insufficient evidence for a rational jury to conclude by a preponderance of the evidence that plaintiff's workplace was permeated with abusive, race-based hostilities.

Defendant's motion for summary judgment on the hostile work environment claim is granted and plaintiff's Title VII hostile work environment claim based on his race and national origin is dismissed.

### c.  Plaintiff's Title VII Retaliation Claim

Title VII prohibits employers from retaliating against employees for filing a charge under Title VII, opposing any practice made unlawful under Title VII, or participating in a Title VII investigation, proceeding, or hearing.  42 U.S.C. § 2000e-3(a).  Like plaintiff's Title VII discrimination claim, a claim for retaliation follows the *McDonnell Douglas* framework.  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  Under the first step of this framework, to sustain a *prima facie* case of retaliation under Title VII, a plaintiff must "demonstrate that (1) [he] engaged in protected activity; (2) the employer was aware of that

activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (citation omitted).

Plaintiff here argues that (1) he engaged in protected activity by complaining to Lt. Marshall and EEO Officer Acholonu; (2) the decision-makers learned of this meeting; (3) defendant subjected plaintiff to an adverse action by terminating plaintiff's employment; and (4) a causal connection can be inferred from the fact that defendant's decision to terminate plaintiff's employment was made merely a few weeks after the meeting.

It is undisputed that plaintiff was terminated and that termination constitutes an adverse employment action. But defendant disputes that plaintiff engaged in protected activity, that the decision-makers were aware of the activity, and that there is a causal connection between the activity and plaintiff's termination.

As to whether the meeting with Lt. Marshall and EEO Officer Acholonu can be considered a protected activity, defendant urges me to deem this element waived, and the entire claim abandoned, because plaintiff's opposition failed to challenge defendant's arguments on this subject. While plaintiff does not address this issue at length in his brief, he does address it, and therefore I decline to find it abandoned. Moreover, the parties do not agree on the content of the conversations between plaintiff and Lt. Marshall and EEO Officer Acholonu. Defendant's argument that the meetings were not protected activity requires a factual finding based on witness credibility, which would be inappropriate on a motion for summary judgment.

With regard to the knowledge prong of the retaliation claim, plaintiff testified that he believes that Eberheardt learned of his EEO complaint because other firefighters may have seen plaintiff at EEO, and they "probably told him." Plaintiff Dep. at 149:16–150:7. Defendant

argues that, even if true, the record offers no evidence that Eberheardt had the authority to make employment decisions and plaintiff has not presented evidence that any of the individuals who made the decision to terminate him had contact with Eberheardt or ever learned of plaintiff's EEO complaint.  However, it not necessary at this stage for plaintiff to show that the individual decision-makers knew that plaintiff had made a complaint to the FDNY's EEO.  *See Alston v. New York City Transit Auth.*, 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998).   Plaintiff's oral complaint to an EEO officer charged with receiving such complaints is sufficient to establish the knowledge prong of his *prima facie* case.

With regard to a causal connection between the protected activity and the adverse employment action, plaintiff must show that retaliation was not just a motivating factor, but the "but-for" cause of the challenged employment action.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).  "However, the but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment . . . indirectly through temporal proximity."  *Zann Kwan*, 737 F.3d at 845.  As a result, plaintiff has established the causal connection prong of a *prima facie* showing of retaliation based on his termination occurring weeks after his EEO meeting.

However, as discussed above, defendant has articulated legitimate, non-retaliatory reasons for the employment action.  Having reached this stage in the *McDonnell Douglas* framework, plaintiff may no longer rely on the presumption of retaliation arising from the establishment of the *prima facie* case.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  Plaintiff must come forward with evidence that the non-retaliatory reason is a mere pretext for retaliation.   *Id.*   Such evidence may involve "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate,

nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan*, 737 F.3d at 846. Notably, however, "but-for" causation in this context "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (footnote omitted).

Although plaintiff asserts that he was terminated because he complained of discriminatory behavior by other members of the FDNY, he presents no evidence to suggest that the documented concerns of the medical staff were mere pretext for a retaliatory motive.  *See, e.g.*, *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).  "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847.  The impact of the timing, which was sufficient for a *prima facie* case, is further diminished at this stage by the fact that the BHS medical records indicate that the reasons for plaintiff's termination, including the physicians' reactions to his claimed medical conditions, generally predate the protected activity.  *Cf. Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

On the preponderance of the evidence, and drawing all reasonable inferences in plaintiff's favor, a reasonable juror simply could not conclude that the defendant's reasons for terminating plaintiff were pretextual and that the but-for reason was retaliation.  Defendant's motion for summary judgment on this claim is granted, and plaintiff's claim for Title VII retaliation is dismissed.

21

### d.  Plaintiff's New York City Human Rights Law Claims

In addition to his federal claims, plaintiff asserts claims for discrimination and hostile work environment under the New York City Human Rights Law on the basis of his age, race, and national origin.  The facts upon which the NYCHRL claims are based include all facts recited above, with the addition of claims relating to plaintiff's age.

It is well-settled that claims brought under the NYCHRL "must be reviewed independently from and more liberally than their federal and state counterparts." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks omitted). "Given this mandate, courts must now develop and apply an independent legal framework whenever analyzing claims brought under Title 8 of the NYCHRL." *Guzman v. City of New York*, 2010 WL 4174622, at *26 (E.D.N.Y. Sept. 30, 2010).  Because the development of this legal framework raises "novel and complex issues of State law," a federal court has discretion to decline to exercise supplemental jurisdiction over them.  *See* 28 U.S.C. § 1367(c)(1).  Having dismissed all federal claims, I decline to exercise this jurisdiction.  The NYCHRL claims are thus dismissed without prejudice.

## IV. Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted. Plaintiff's claims under Title VII are dismissed with prejudice.  Plaintiff's claims asserted under the NYCHRL are dismissed without prejudice.  The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

                                        _____/s/_____

                                        **NINA GERSHON**
                                        **United States District Judge**

October 20, 2021
Brooklyn, New York